IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LARRY DEAN SMITH, JR., <br><br> Plaintiff, <br><br> vs. <br><br> CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration, <br><br> Defendant. | CASE NO. 7:13CV5004 <br><br> MEMORANDUM AND ORDER |

Larry Dean Smith, Jr., filed a complaint on April 26, 2013, against Carolyn W. Colvin, the Acting Commissioner of the Social Security Administration. (ECF No. 1.) Smith seeks a review of the Commissioner's decision to deny his application for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq., and supplemental security income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. The defendant has responded to Smith's complaint by filing an answer and a transcript of the administrative record. (See ECF Nos. 7, 8). In addition, pursuant to the order of Magistrate Judge Thomas D. Thalken, dated August 8, 2013, (ECF No. 11), each of the parties has submitted briefs in support of his or her position. (See generally Pl.'s Br., ECF No. 14; Def.'s Br., ECF No. 19, Pl.'s Reply Br., ECF No. 20). After carefully reviewing these materials, the court finds that the Commissioner's decision must be affirmed.

### I. PROCEDURAL HISTORY

Smith, who was born on May 18, 1990, (Tr. 10, 38) filed an application for disability benefits under Title II on February 25, 2011, and an application for SSI

benefits under Title XVI on February 25, 2011. (Tr. 10, 105-12). He alleged an onset date of May 18, 1990, or birth. (Tr. 10). His claim was denied initially on March 29, 2011, and on reconsideration on June 3, 2011. (Tr. 10, 44, 53). Smith requested a hearing before an administrative law judge (ALJ) (tr. 10, 57), and the hearing was held on April 30, 2012. (Tr. 20-33). In a decision dated May 8, 2012, the ALJ found that Smith was not disabled. (Tr. 15).

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520(a). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five. *See id.* Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(i), (b). The ALJ found that Smith had not been engaged in substantial gainful activity since October 1, 2010, the earliest date of insurance coverage. (Tr. 12).

Step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(c). A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement." *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."). Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple

instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(ii), (c). The ALJ found that Smith had the following severe impairment: diabetes mellitus, type 1. (Tr. 12).

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments. *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d); *see also* 20 C.F.R. Part 404, Subpart P, App'x 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926). If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled." *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d). If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five. *See* 20 C.F.R. § 404.1520(a). The ALJ found that Smith did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 12).

Step four requires the ALJ to consider the claimant's residual functional capacity (RFC)[1] to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." *See* 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f). If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iv), (f). The ALJ found that Smith had no past relevant work. (Tr. 14).

---

[1] "'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)).

At step five, the ALJ must determine whether the claimant is able to do any other work considering his RFC, age, education, and work experience. If the claimant is able to do other work, he is not disabled. The ALJ found that Smith had the RFC to perform the full range of light work as defined in 20 C.F.R. §§ 404.1567(b) 416.967(b). (Tr. 13). Because Smith had no past relevant work, transferability of job skills was not an issue. (Tr. 14). The ALJ determined that there are jobs that exist in significant numbers in the national economy that Smith could perform. (Tr. 14). Therefore, Smith had not been under a disability from October 1, 2010, through the date of the decision. (Tr. 15). The Appeals Council of the Social Security Administration denied Smith's request for review on February 25, 2013. (Tr. 1-6.) Thus, the ALJ's decision stands as the final decision of the Commissioner, and it is from this decision that Smith seeks judicial review.

## II. FACTUAL BACKGROUND

**A.  Medical Evidence**

Smith was diagnosed with new onset diabetes mellitus, type 1, after going to the hospital on November 16, 2010. (Tr. 227, 233). At that time, he reported no numbness or weakness in his extremities. (Tr. 237). His motor strength was full on both upper and lower extremities and he had normal muscle tone and deep tendon reflexes. (Tr. 237). He had no evidence of diabetic ketoacidosis (DKA). (Tr. 237).

On November 19, 2010, Smith saw Victor Adalbert G. de Villa, M.D., an endocrinologist, for an initial consultation for management of diabetes. (Tr. 198-201). Smith reported that he was receiving insulin by injection and that he was satisfied with that treatment. He said the increased thirst and nocturia he had earlier were improving. Smith reported no associated tingling and numbness in fingers or toes, blurred vision,

fatigue, chest pain, shortness of breath, foot pain, or calf claudication. (Tr. 198). Smith was reported to be cooperative and well-groomed, not anxious or depressed, and well-nourished and well-hydrated. (Tr. 199).

On January 6, 2011, Smith reported peripheral neuropathy to his primary care physician, Janet Bernard, M.D. (Tr. 276). He was prescribed Neurontin, and a few weeks later, Mobic was added to his medication regimen after Smith reported that Neurontin was not helping with the pain. Smith described the pain as a throbbing, achy pain, but he could not tell if it was in the front or back of his leg. Smith said the pain did not extend down to his feet and he had no numbness. (Tr. 276).

On January 26, 2011, Dr. de Villa reported that the control of Smith's diabetes had improved significantly. (Tr. 202, 204). Smith reported calf pain with walking. (Tr. 202). The Mobic was stopped on February 3, 2011, because it had not helped the peripheral neuropathy. (Tr. 276). Smith was directed to continue with Neurontin and add Tramadol. Dr. Bernard noted that she wanted to try to find a non-narcotic drug that would help with neuropathy. (Tr. 248). On February 13, 2011, Smith went to the hospital complaining of lower extremity pain that had started several months earlier but was not improving. (Tr. 224). He was alert and oriented. His range of motion was normal, he had normal gait, and he had no motor deficit. (Tr. 225). A few days later, Dr. Bernard noted that she was hesitant to start narcotics because Smith was "just a set up for addiction." She added an antibiotic and additional pain relievers to his medication regimen. (Tr. 249).

On April 26, 2011, Smith reported that his diabetic neuropathy was a little better. Dr. Bernard stated that she would provide a letter for attorneys to help him get disability.

5

She directed Smith to continue his current medications. She offered Ketamine cream for the neuropathy, but because of the cost and because his feet were feeling better, Smith declined to try the cream. (Tr. 264).

In April 2011, Dr. Bernard wrote a letter to a law firm in support of Smith's request for disability. (Tr. 266). She noted that he had a "terrible time" with severe diabetic neuropathy and had "great difficulty with pain and balance" because of the neuropathy. She stated that she did not think he would be able to work for at least one full year. (Tr. 266). In June 2011, Smith was hospitalized for DKA. (Tr. 278).

On July 26, 2011, Dr. Bernard wrote another letter, addressed "[t]o [w]hom [i]t [m]ay [c]oncern," stating that Smith had struggled with his diabetes since its diagnosis in November 2010. (Tr. 268). She stated that he had developed severe peripheral neuropathy with pain in both legs from the knees down and had trouble ambulating. Medication had helped, but he continued to have discomfort. Dr. Bernard said that Smith was not able to continue hauling scrap metal which required lifting and walking. His educational status was such that he was going to have to do manual labor and Dr. Bernard said that would be difficult for him given the condition of his diabetes, the fact that he had numerous episodes of DKA, and had severe diabetic neuropathy. (Tr. 268).

On the same date, Dr. Bernard completed a diabetes mellitus impairment questionnaire, in which she stated that Smith's prognosis was poor. (Tr. 269). She stated that he had severe radiculopathy in both feet and muscle weakness and wasting. He also had difficulty walking. (Tr. 269). She indicated that Smith had frequency of urination, hyper/hypoglycemic attacks, fatigue, general malaise, excessive thirst, insulin shock/coma, and difficulty thinking/concentrating. (Tr. 270). Dr. Bernard stated that

6

Smith could sit, stand or walk for one hour in an eight-hour day, and it would be necessary for him not to sit continuously. He would need to get up and move around every 10 to 15 minutes and then could sit again after 10 to 15 minutes. (Tr. 287). She stated that he could frequently lift up to 20 pounds and could occasionally lift more than 50 pounds. (Tr. 287). He could frequently carry up to 10 pounds, occasionally lift up to 50 pounds, and never carry more than 50 pounds. (Tr. 287-88).  Dr. Bernard indicated that Smith was not a malingerer. She said Smith was capable of low work stress. (Tr. 271). He had constant pain and needed to avoid temperature extremes and heights. (Tr. 271-72).

The records show that Smith did not see Dr. Bernard again until February 1, 2012, when she refilled his Neurontin prescription. (Tr. 292). On March 22, 2012, Smith reported that he was doing better from a neuropathy standpoint, and Dr. Bernard noted that he looked better as he had gained some weight and his color was better. On May 29, 2012, his insulin was increased. (Tr. 292).

**B.    Medical Opinion Evidence**

Jerry Reed, M.D., completed a physical RFC assessment on March 23, 2011. (Tr. 251-58). Reed stated that Smith could occasionally lift 50 pounds and frequently lift 25 pounds. (Tr. 252). He could stand and/or walk and sit for about six hours in an eight-hour workday. He was unlimited in his ability to push and/or pull. (Tr. 252). Smith had no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 252-55). Dr. Reed noted that when Smith was diagnosed with diabetes mellitus in November 2010, his neurological exam was intact, as was his strength. His sensation was normal. In February 2011, Smith went to the hospital for lower extremity pain, but he had normal

7

range of motion and gait, and no edema or motor deficit. Dr. Reed stated that Smith's limitations were out of proportion to what was reported in the exams, and he was considered partially credible. (Tr. 258).

On June 3, 2011, Glen Knosp, M.D., affirmed Reed's RFC assessment. (Tr. 267). Dr. Knosp noted that Smith had not alleged any changes in his health since the earlier report. Dr. Knosp gave little weight to Dr. Bernard's opinion as a treating source. Although Dr. Bernard stated that Smith had trouble with balance and pain, none of her treatment notes from examinations reported significant pain or balance problems. Examinations from other providers reported normal gait and no decreased sensation or balance problems. Also, on the date of Dr. Bernard's letter, an examination showed that Smith's diabetes was under good control. (Tr. 267).

**C.    Hearing Evidence**

At a hearing on April 30, 2012, Smith amended his onset date to January 1, 2011. He said he was disabled due to severe diabetes, which caused neuropathy and muscle weakness and wasting. He also had ketoacidosis. (Tr. 24-25).

Smith testified that he had pain in both feet that felt like someone was poking him with needles in the bottom of his feet. (Tr. 25). He said the pain comes and goes, but is present most of the day. (Tr. 25). Smith said the pain interferes with his concentration because it hurts too much to even watch television. He said there is nothing he can do to make the pain better. (Tr. 26). He lies down for three to four hours a day. The medications cause drowsiness. He has difficulty sleeping and He sleeps about four or five hours a night. (Tr. 26-27).

Smith said he does not use a cane or walker. (Tr. 27). In the past year, his treatment had been medications only. (Tr. 29). He lived with his parents and spent time lying on the bed or couch watching television. (Tr. 29). He said he does not get out of the house very often, but he has friends with whom he socializes. (Tr. 30). He was admitted to the hospital in June 2011 for acute ketoacidosis, but had not been in the hospital since then. (Tr. 30). Smith said he could sit for about 15 to 20 minutes and then needed to stand up to move to see if it helped the pain. (Tr. 30).

**D.   Additional Evidence**

On a daily activities report completed on March 7, 2011, Smith stated that he could not do any activities because the diabetic neuropathy in his feet caused pain when he walked. (Tr. 157). He lived with family and did no cooking or chores. (Tr. 157). He said he drove very little because of the pain in his feet. (Tr. 157). He had no hobbies, although he said he watched television for four or five hours at a time. (Tr. 158). Smith said he slept four hours a night. He could not go to the grocery store. Smith stated he could stand about 10 to 15 minutes at a time. (Tr. 158). There was no limit to the length of time he could sit at one time. (Tr. 158). Smith said his feet are red and warm and it feels as if they are being pinched. (Tr. 159). He said the pain is constant and he has more bad days than good days. (Tr. 159). He said he stopped working because he could not walk for a long period of time. (Tr. 160). Smith said he had no side effects from medications, which did not relieve the symptoms for very long. (Tr. 160).

Smith's last employment was cutting and loading scrap iron from 2009 to December 2010. He was self-employed. (Tr. 184). Prior to that, he worked as a roofer helper from May to August 2008. (Tr. 187).

## III. STANDARD OF REVIEW

This court must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." *Johnson v. Chater*, 108 F.3d 178, 179 (8th Cir. 1997) (quoting *Clark v. Chater*, 75 F.3d 414, 416 (8th Cir. 1996)). *See also Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011). "Substantial evidence is less than a preponderance but enough that a reasonable mind might accept as adequate to support the conclusion." *Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013) (internal citations omitted). A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010). Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted). *See also Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

This court must also determine whether the Commissioner's decision "is based on legal error." *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (quoting *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Id.* (citations omitted). No deference is owed to the Commissioner's legal conclusions.

*See Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003). *See also Collins*, *supra*, 648 F.3d at 871 (indicating that the question of whether the ALJ's decision is based on legal error is reviewed de novo).

## IV.　ANALYSIS

### A.　Failure to Follow the Treating Physician Rule

Smith first argues that the ALJ erred by failing to give deference to the opinion of his treating physician. (Pl.'s Br. at 5). Smith relies on *Tilley v. Astrue*, 580 F.3d 675, 679, (8th Cir. 2009), in which the appellate court stated, "A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.' 20 C.F.R. § 404.1527(d)(2)."

The ALJ gave little weight to the medical source statement of Dr. Bernard because it was not supported by the medical record. The ALJ noted that Dr. de Villa's report did not support the extreme limitations imposed by Dr. Bernard. Although she stated that Smith had muscle wasting and difficulty with thinking or concentration, the medical record did not document any of those problems. The ALJ noted that Smith had not needed any intervention other than medication. He used no assistive device and no physical examination in the record documented balance problems or pain due to neuropathy. (Tr. 14).

Dr. Bernard noted that Smith's blood sugar levels were in good control in February 2011. (Tr. 248-49). Her treatment notes indicate that medications were adjusted periodically until April 2011, which was within five months of the initial diagnosis. (Tr. 264, 278, 292). No changes were made to Smith's medication regimen

11

after that date. In April 2011, Smith reported that the neuropathy was feeling better. (Tr. 264). Dr. Bernard completed a medical source statement in July 2011, but he received no further medical treatment for eight months. (Tr. 268-72, 278, 292).

In the diabetes mellitus questionnaire completed by Dr. Bernard, she indicated that Smith had frequency of urination, hyper/hypoglycemic attacks, fatigue, general malaise, excessive thirst, insulin shock/coma, and difficulty thinking/concentrating. (Tr. 270). However, none of her treatment notes reports any of these symptoms. She stated in a letter that Smith had "numerous episodes of DKA," but the record indicates only one hospitalization for the condition. (Tr. 268, 30, 279). Dr. Bernard stated that Smith had a lot of trouble walking, but he had a normal gait and did not use any assistive device to walk. (Tr. 27, 225, 268-69). She also indicated that Smith had muscle weakness and muscle wasting, but no doctor observed any muscle wasting and Smith was found to have normal strength. (Tr. 224-25, 228, 237, 239). Thus, the medical records did not support the opinion of Dr. Bernard.

"The ALJ must evaluate the record as a whole and while treating physicians' opinions are 'entitled to special weight,' they are not automatically controlling." *Turpin v. Colvin*, ___ F.3d ___, 2014 WL 1797396 *3 (8th Cir. 2014), *quoting Bentley v. Shalala*, 52 F.3d 784, 785–86 (8th Cir. 1995). An ALJ may discount or disregard a treating physician's opinion "where other medical assessments 'are supported by better or more thorough medical evidence,' or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Turpin*, *supra*, *quoting Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000). An ALJ may give less weight to a conclusory or inconsistent opinion by a treating physician. *Turpin*, *supra*.

Dr. Bernard's opinion was not consistent with other medical evidence in the record. The record must be evaluated as a whole to determine whether the treating physician's opinion should control. *Tilley*, *supra*. The ALJ considered the entire record and provided sufficient support for his determination to give less weight to Dr. Bernard's opinion.

**B.     Failure to Properly Evaluate Smith's Credibility**

Smith next argues that the ALJ erred in his evaluation of Smith's credibility. The ALJ followed the two-step process and first determined that Smith had an impairment that could be shown by medically acceptable clinical and laboratory diagnostic techniques that could reasonably be expected to produce Smith's pain or other symptoms. The ALJ then evaluated the intensity, persistence, and limiting effects of Smith's symptoms to determine the extent to which they limit Smith's functioning. Because statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms were not substantiated by objective medical evidence, the ALJ was required to make a finding on the credibility of Smith's statements based on a consideration of the entire case record. (Tr. 33).

The ALJ reviewed Smith's testimony about his pain and noted that Smith's medications made him sleepy and that he did not use a cane or walker. (Tr. 13). The ALJ found that Smith's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the RFC assessment. (Tr. 13).

The medical records indicate that when Smith was examined by a physician, he was alert, oriented, and cooperative, and had a normal gait, normal range of motion,

mild sensory deficits, and full strength. (Tr. 199-200, 203, 224-25, 228, 237, 239). He denied any fatigue, nausea, weakness, numbness, or tingling. (Tr. 198-99, 202, 276). There was no evidence in the record, other than Dr. Bernard's opinion, that Smith had any complaints of muscle wasting, malaise, hyperglycemia or hypoglycemia attacks, or insulin shock or coma. No physician reported that Smith appeared in acute distress.

In assessing a claimant's credibility, an ALJ must consider all of the evidence related to the subjective complaints, the claimant's daily activities, observations of third parties, and the reports of treating and examining physicians. *McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011), *citing Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). If an ALJ explicitly discredits a claimant's testimony and gives good reasons for doing so, a reviewing court will normally defer to the ALJ's credibility determination. *McCoy*, *supra*, *citing Gregg v. Barnhart*, 354 F.3d 710, 713–14 (8th Cir. 2003).

While applying for disability, a state agency employee indicated that Smith had no difficulty with sitting, standing, walking, understanding, concentrating, or coherency. (Tr. 139). Dr. Reed determined that Smith had normal range of motion and gait, and no edema or motor deficit. He opined that Smith was partially credible because his limitations were out of proportion to the medical records. (Tr. 258). Dr. Knosp affirmed Reed's RFC assessment. (Tr. 267). The ALJ considered the opinions of the state agency physicians, but gave Smith the benefit of the doubt and found he was limited to light exertional work, instead of medium exertional work.

"A disability claimant's subjective complaints of pain may be discounted if inconsistencies in the record as a whole bring those complaints into question." *Gonzales v. Barnhart*, 465 F.3d 890, 895 (8th Cir. 2006). Regulations provide that, in

evaluating the intensity and persistence of a claimant's symptoms, such as pain, the agency considers all available evidence to determine the extent to which the symptoms limit the claimant's capacity for work. 20 C.F.R. § 416.929(c)(1).

As the Commissioner points out, the issue is not whether Smith had diabetic neuropathy, but to what extent it imposed limitations on his ability to work. (Def.'s Br. at 12). The question of the credibility to be attached to a claimant's testimony is ultimately to be determined by the ALJ, who is in the best position to make that decision. *Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir. 2008). The ALJ's determination of Smith's credibility is supported by the record.

### C.     Reliance on Medical-Vocational Guidelines

Finally, Smith argues that the ALJ erred by relying on the Medical-Vocational Guidelines. The ALJ noted that he was required to consider the claimant's RFC, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 to determine whether a claimant can make a successful adjustment to other work. (Tr. 15). If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either disabled or not disabled depending upon the claimant's specific vocational profile. The medical-vocational rules are used as a framework for decision-making unless there is a rule that directs a conclusion of disabled without considering the additional exertional and/or nonexertional limitations. The ALJ found in this case that Medical-Vocational Rule 202.20 directed a finding that Smith was not disabled. (Tr. 15).

Smith argues that his impairment is also nonexertional in nature because his chronic pain impairs his memory, concentration, and focus. As such, he argues that he did not fit into a particular exertional category to allow a determination of disability under the guidelines. (Pl.'s Br. at 15).

The ALJ found that Smith's credibility was not supported by the record, as noted above. The ALJ took into consideration Smith's credibility and the entire record. He found that there are jobs that exist in significant numbers in the national economy that Smith could perform. This finding was based on Smith's RFC, age, education, and work experience in conjunction with the guidelines (Tr. 14-15). The ALJ did not err in finding that Smith could perform a full range of light work and that Smith was not disabled.

## V. CONCLUSION

For the reasons discussed, the court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and should be affirmed. Accordingly,

IT IS ORDERED:

1. The Commissioner's decision is affirmed;

2. The appeal is denied; and

3. Judgment in favor of the defendant will be entered in a separate document.

Dated this 28th day of May, 2014

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge